1     **UNITED STATES DISTRICT COURT**
      **SOUTHERN DISTRICT OF TEXAS**
2       **HOUSTON DIVISION**

3

4 UNITED STATES OF AMERICA  *  1:12-CR-435-1
           *  Houston, Texas
5 VS.         *
           *  9:32 a.m.
6 TOMAS YARRINGTON RUVALCABA *  August 28, 2019

7

      **MOTION TO SUBSTITUTE COUNSEL**
8

9   **BEFORE THE HONORABLE HILDA G. TAGLE**
      **UNITED STATES DISTRICT JUDGE**
10

11 **APPEARANCES:**

12 **FOR THE GOVERNMENT:**
 **Jody L. Young, Jon Muschenheim and Karen F. Betancourt**
13 **OFFICE OF THE U.S. ATTORNEY**
 600 E. Harrison, Suite 201
14 Brownsville, Texas 78501
 956.548.2554
15

16 **FOR THE DEFENDANT:**
 Chris Flood
17 FLOOD & FLOOD
 914 Preston, Suite 800
18 Houston, Texas 77002
 713.223.8877
19 Mervyn Milton Mosbacker, Jr.
 Attorney at Law
20 277 Allen Pkwy., Suite 1000
 Houston, Texas 77019
21 713.526.2246

22 Court Reporter:
 Johnny C. Sanchez, RPR, RMR, CRR
23 515 Rusk, #8004
 Houston, Texas 77002
24 713.250.5581

25 Proceedings recorded by mechanical stenography.  Transcript
 produced by computer-assisted transcription.

1          THE COURT:  All right.  First of all,

2   counsel, those of you who are here when I call the case,

3   please announce your name for the record and whom at you

4   represent.

5               The Court now calls 12-CR-435-1, United

6   States of America verus Tomas Yarrington Ruvalcaba.

7               What says to the government?

8               MR. YOUNG:  Jody Young, for the United

9   States Your Honor.

10              MR. MUSCHENHEIM:  Jon Muschenheim for the

11  United States.

12              MS. BETANCOURT:  Good morning.  Karen

13  Betancourt for the government.

14              THE COURT:  All right.  What says the

15  defendant?

16              MR. MOSBACKER:  Mervyn Mosbacker for

17  Mr. Yarrington.

18              MR. FLOOD:  And --

19              THE COURT:  Excuse me.  Before I hear anyone

20  else, the Court gave permission to co-counsel to not

21  appear, since it was my understanding, Mr. Mosbacker, that

22  you were going to be here.

23              MR. MOSBACKER:  Yes, that's correct.

24              THE COURT:  Before the Court, then, is the

25  defendant's motion for substitution of counsel.

1                    So, counsel, if you will announce your

2    name for the record.

3                    MR. FLOOD:  Thank you, Your Honor.  Chris

4    Flood.  I'm seeking to represent the defendant.

5                    THE COURT:  Exactly.  Okay.  So, first of

6    all, since this is a motion that has been filed that in

7    the -- it's my understanding, Mr. Mosbacker, you and

8    Mr. Monarrez are not opposed to, first of all.

9                    MR. MOSBACKER:  No, we are not, Your Honor.

10                   THE COURT:  But the government being

11   opposed, since this is your motion, Mr. Flood, you'll need

12   to address the Court on your argument and any evidence you

13   proffer, or that you're saying you're going to have before

14   the Court in an effort to determine whether this motion

15   should be granted.  And then the government will be

16   allowed to respond, and you may close.

17                   All right.  Thank you.  You may address

18   the Court.

19                   MR. FLOOD:  Thank you, Your Honor.  The only

20   evidence that I have for the Court's consideration --

21                   THE COURT:  Mr. Flood, to the podium.

22                   MR. FLOOD:  I'm so sorry.  Good morning,

23   Your Honor.

24                   THE COURT:  Good morning.

25                   MR. FLOOD:  The only evidence that I have

1  for the Court's consideration actually it's all already

2  been attached in the sealed pleadings.  But I have the

3  original declarations of both Mr. Zarate, or actually four

4  individuals.  The original declaration of Mr. Zarate, the

5  declaration of Matt Alford, who is the Houston attorney

6  who spoke to Mr. Zarate by phone, I have both in English

7  and Spanish the declarations by the defendant

8  Mr. Yarrington, and then I have the declarations by --

9  that's already been attached by Cordt Akers, who is also a

10  Houston attorney who spoke with Mr. Yarrington

11  independently without me being present.

12              THE COURT:  All right.  So are you offering

13  those as exhibits?

14              MR. YOUNG:  I'm offering Exhibits 1, 2, 3A

15  and 3B, Your Honor.  It's the same declaration in English

16  and in Spanish.  And then Defendant's Exhibit 4.

17              THE COURT:  All right.  Any objection to the

18  offer?

19              MR. MOSBACKER:  No, Your Honor.

20              THE COURT:  Admitted.

21              MR. FLOOD:  Your Honor, I assume that the

22  Court has read my response to the government's request for

23  a Rule 44(c) hearing, as well as the reply to their

24  response?

25              THE COURT:  Yes, I did.

1            MR. FLOOD:  I just ask the Court to consider
2    as our position that what -- first of all, as the Supreme
3    Court has held in Holloway and on occasion, it's actually
4    defense counsel who is in the best position to know when
5    there may be a potential conflict of interest that could
6    arise in the representation of the defendant.
7            And, as you know, Your Honor, I've been
8    doing this for almost 30 years, and I don't see a conflict
9    in my representation of Mr. Yarrington, but to the extent
10   that there may be a potential conflict, I think it's been
11   satisfied by the waivers that have been executed by both
12   parties.
13           And just to be clear -- let me just get my
14   rule book.  One minute, Your Honor.
15           I believe it's the Texas Rules of
16   Professional Conduct that control of whether or not
17   counsel has a conflict of interest in this matter.
18           The applicable rule, Rule 1.09, which
19   mirrors the ABA rules of professional conduct, relates to
20   a situation where I would be taking on representation of
21   Mr. Yarrington when I had a former client that could
22   arguably be considered to be involved in a related matter.
23           I don't believe there's been any showing,
24   and even with the proffer by the government -- and I've
25   talked to the government prior to this hearing -- and they

1    plan on putting before the Court some evidence that

2    Mr. Zarate, the allegation will be that Mr. Zarate was

3    involved with Mr. Yarrington in the offense.

4                    Even with that, I don't believe that there

5    has been a showing or will be a showing that it's adverse

6    to Mr. Yarrington, that Mr. Zarate and Mr. Yarrington are

7    adverse to each other.

8                    THE COURT:  Excuse me just a second.  We're

9    having some technical issue.  I want to confirm the

10   translator.

11                   MR. FLOOD:  Yes, Your Honor.

12                   THE COURT:  All right.  Thank you.  Proceed.

13                   MR. FLOOD:  And it's actually that Rule 109

14   that says.

15                   THE INTERPRETER:  I'm sorry.

16                   MR. FLOOD:  That's okay.

17                   THE INTERPRETER:  I'm ready.

18                   THE COURT:  Okay.  Go ahead.

19                   MR. FLOOD:  So just assuming for argument

20   purposes there's a substantially related matter, even

21   though they're not co-defendants, they're not charged in

22   the same indictment, and they won't be sitting in the same

23   trial together, and according to the government as early

24   as this morning, there's no real possibility that

25   Mr. Zarate will be a witness against Mr. Yarrington in

1    this trial.

2                    So assume for argument purposes only that

3    they are related matters, that is, that the allegations

4    against Zarate in a separate indictment include

5    allegations that also include Mr. Yarrington, they are not

6    co-defendants.  And it's not a situation where I'm trying

7    to engage in multiple representation of two defendants in

8    the same case, which is even allowed under certain

9    circumstances, Your Honor.

10                   It's also not a situation where, as I said

11   a minute ago, Mr. Zarate is going to be a government

12   witness against Mr. Yarrington.  I think under that

13   circumstance, under Rule 105, there could be confidential

14   communications between Mr. Zarate and myself, which I

15   think through his declaration clearly shows they weren't,

16   but under that situation, there could be a potential for a

17   conflict because I would have to cross-examine the former

18   client, but he's not a witness in this case, and he won't

19   be a witness in this case.  And he's not a defendant who I

20   need to somehow protect sitting at counsel table

21   because I:  One, he's not a co-defendant; and, two, I no

22   longer represent him.  He's not a current client of mine.

23   He's a former client in a civil forfeiture matter from

24   three years ago.

25                   Now, I would also agree with the

 1  government somewhat if there was some problem with some of
 2  the things that were filed in the forfeiture case if
 3  somehow Mr. Zarate, through me, had filed a pleading in
 4  that forfeiture case that somehow implicated
 5  Mr. Yarrington, because then, the situation could arise
 6  where I'm taking a conflicting position, meaning I'm
 7  speaking out of both sides of my mouth.  On the one hand
 8  I'm saying that Zarate was not involved but Yarrington
 9  was, and now I'd be speaking on the other side of the
10  mouth and say that Yarrington was not involved but Zarate
11  was.  But that's not the situation at all.
12              I'm not in a position where I'm taking
13  inconsistent positions in the court, Your Honor, and I
14  don't have competing interests.  I have no interest in
15  representing Mr. Zarate.
16              And my former representation of him does
17  not conflict me because there's no violation of Rule 105
18  of confidential communication.  And even if there was,
19  Your Honor, Mr. Zarate and Mr. Yarrington have both
20  consented to my representation.  And the Rule clearly
21  states that even if there is a situation where it's
22  determined that my representation of Zarate was adverse,
23  even if it's determined that my representation of
24  Yarrington could result of me having these confidential
25  communications, even under those situations, if both

1    clients consent, then counsel doesn't have a conflict.

2                     Now, the third prong the Court needs to

3    consider is this idea that the conflict is so bad that it

4    affects the integrity of the Court, or the judicial

5    proceeding, that people might look out and say, you know,

6    that there's no way Mr. Flood can represent Yarrington

7    after representing Zarate.

8                     I've looked at the cases cited by the

9    government, and none of them are on point in this case,

10   Your Honor.  In those cases you have the situation

11   where -- that the Court -- as the Court is well aware, the

12   case involving Guy Womack, where he represented multiple

13   defendants during a trial, and represented a government

14   witness.  That's not the situation here at all.

15                    So I don't believe that the cases cited by

16   the government for the proposition that this affects the

17   judicial integrity of the proceedings actually apply in

18   this case, Your Honor.

19                    THE COURT:  Mr. Young?

20                    MR. YOUNG:  Yes, Your Honor.

21                    THE COURT:  Also, anything -- before

22   anything else from the government, I just wanted clarify

23   the complete name of at least one of the financial

24   institutions, because I know that that's a very big bank,

25   International Bank of Commerce.  But is it Inter space

 1  National Bank a totally different entity from

 2  International Bank of Commerce?

 3              MR. YOUNG:  It's one word.

 4              THE COURT:  Is it International Bank?

 5              MS. BETANCOURT:  INB, Your Honor, is a

 6  different -- INB is a different bank from IBC.  They are

 7  two completely different entities.

 8              THE COURT:  Okay.

 9              MS. BETANCOURT:  IBC is based in Laredo.

10  INB is a bank InterNational, capital N, bank, is a bank

11  based in McAllen.  They are two different banks.

12              THE COURT:  So there's no space.  It would

13  be Inter, no space, and then capital National Bank, or --

14  I just want the correct spelling.

15              MR. MUSCHENHEIM:  It's International Bank,

16  Your Honor --

17              THE COURT:  Excuse me.  Thank you.  For the

18  record I need to be clear about who is speaking.

19              MR. MUSCHENHEIM:  Yes, Your Honor.

20              THE COURT:  I'm sorry.  What was it that you

21  said?

22              MR. MUSCHENHEIM:  It's Inter, they call it

23  one word, they put a capital N, National Bank, that is

24  now, though, become Vantage Bank.

25              THE COURT:  Okay.  Effective when?

1            MR. MUSCHENHEIM:  It became Vantage Bank --
2   I knew that.  Last -- in 2018.
3            THE COURT:  More recent time?
4            MR. MUSCHENHEIM:  Yes.  Yes.  They went
5   through the process of having a charter.  It's now
6   actually Vantage Bank.
7            THE COURT:  And is the government going to
8   be moving to amend the indictment to allege a new --
9            MR. MUSCHENHEIM:  I think it will be clearer
10  if we use the previous entity's name, Your Honor.  We can
11  get the historic, the FDIC charter on that, Your Honor.
12            THE COURT:  All right.  Thank you.
13            MR. YOUNG:  Thank you, Your Honor.
14            We did meet with Mr. Flood this morning to
15  try to streamline the hearing for you.  Our purpose is to
16  present what we believe will be some facts in the case
17  that apply to directly to Pablo Zarate and the
18  relationship with the defendant, so that you can make an
19  informed decision about a Garcia hearing, or what feel is
20  best in the case.
21            So we did work with the defense today in a
22  way to have a proffer from the United States, again, to
23  help you with that.
24            Basically, there's several different
25  points of contact between Zarate and this defendant.  In

1  the indictment itself, there is reference to and several

2  overt acts that deal with Premier, a limited corporation.

3  Premier was a business entity created solely to buy the

4  Pilatus plane for approximately, I believe, $3 million

5  that Zarate ultimately took over the, if you will,

6  ownership.  And that was the litigation which Mr. Flood,

7  Mr. Chris Flood represented Pablo Zarate in.

8               Pablo Zarate is indicted, he's not

9  technically a co-defendant here because he was indicted, I

10 believe, about two years later, but he was indicted in

11 part because of this Pilatus plane.

12              Basically, we intend to introduce at least

13 four witnesses at trial.  One is the mistress of the -- a

14 mistress of the defendant.  One is --

15              THE COURT:  Named who?

16              MR. YOUNG:  That's Cindy Chapa, Eduardo

17 Rodriguez Berlanga, Antonio Pena, and Sonia De Pau.  Sonia

18 De Pau is the --

19              THE COURT:  Spell that name, please, the

20 last name.

21              MR. YOUNG:  D-e, space, Pau.

22              And so with regards to the Pilatus, it was

23 originally purchased by Fernando Cano the co-defendant in

24 this case.  Antonio Pena has provided evidence in the

25 investigation, that that was really a plane for

 1  Yarrington, the defendant.

 2                And we have some circumstantial evidence

 3  of flights that the defendant took on the plane with the

 4  manifests, we have Pena flying with him.  And the only

 5  thing that Premier did was to get a loan to buy the plane.

 6                Cano was taken out of that ownership and

 7  Zarate came in.  And it's a way, again, we're going to

 8  allege, both in the bank fraud conspiracy, as well as the

 9  money laundering conspiracy, to move money by the

10  defendant through corruption, drug-trafficking, what have

11  you, into the United States.  A way to purchase assets

12  here as a way to launder.  So there's a tie there.

13                Mr. Flood represented the defendant --

14  excuse me -- Zarate in the civil proceeding that dealt

15  with the forfeiture.  Zarate, Mr. Zarate lost that plane

16  through fugitive disentitlement.  Mr. Flood has said he's

17  not co-defendant.  He won't be sitting there.  He won't be

18  sitting there because he's a fugitive.  It's that simple.

19  I mean, maybe the fact that he is a fugitive might help

20  with your decision, but if he were here, though, we would

21  be wanting to talk to him through Mr. Flood, or whomever

22  would represent him now, obviously, just -- and we would

23  be going to Mr. Mosbacker if Mr. Zarate was here, and we

24  would ask Mr. Mosbacker right now, "What can this

25  defendant do to help himself out"?

1                    Now, we don't know what decisions would be
2    made through that, but that goes to that divided loyalty
3    that is at risk here.  So the plane has a connection with
4    Zarate.  More as directly is we have -- and we included as
5    two exhibits for you -- we didn't want to over-paper
6    this -- but the general overlay is that Eduardo Berlanga
7    took out $3 million, approximately, in loans, back in --
8    when Yarrington, the defendant, was governor and shortly
9    thereafter.
10                   THE COURT:  Are you going to be doing --
11   what you're telling me now, you discussed with
12   Mr. Flood --
13                   MR. YOUNG:  Yes.
14                   THE COURT:  -- and he has agreed that this
15   is what would be the evidence, so it's a proffer, by
16   agreement?
17                   MR. FLOOD:  Yes, Your Honor.  As far as the
18   factual assertions he was making, I will stand up and
19   object.  If I don't agree with it --
20                   THE COURT:  Okay.
21                   MR. FLOOD:  I don't agree with the argument
22   in part where he says that there's a divided loyalty,
23   things like that.
24                   THE COURT:  It's a factual --
25                   MR. FLOOD:  But a factual assertion, I'll

1  let you know, Your Honor, if that's not our agreement.

2  How is that?

3            THE COURT:  Good.  Thank you.

4            MR. YOUNG:  And for the purpose of this

5  hearing, the proffer would be that Berlanga took out

6  approximately $3 million of loans in the early 2000s.  And

7  he used this collateral, three ranches that we have from

8  other witnesses, ties to Yarrington, although not in name,

9  three Mexican ranches, but they were used as collateral.

10           Berlanga defaulted on those loans in 2007.

11 There was a civil judgment, a default judgment against

12 Berlanga in approximately 2009.

13           Mr. Zarate takes out a 1.3 million-dollar

14 loan in approximately 2010, and that loan is used to

15 satisfy the debt that Berlanga had, because our witnesses

16 will tell us that they were concerned of losing those

17 ranches because they were used as collateral.

18           He then takes, Mr. Zarate, a

19 3 million-dollar loan out in 2011, and what you'll see --

20 and I believe it's Exhibit 2 -- is basically a check where

21 these are not large amounts of money, given the rest of

22 the indictment, but that Mr. Zarate, for some reason --

23 and the evidence would show that Mr. Zarate was a former

24 cabinet member of Yarrington.  And there's a long

25 relationship there.  But starting in 2011, 2012, for some

1  reason, Mr. Zarate began making maintenance and support
2  payments through his First National Bank through this loan
3  to Cindy Chapa, the mistress of the defendant.
4             So you'll see a check that was for
5  approximately $930 that pays for a BMW.  And some of the
6  bank notes say Cindy Chapa on it.  It will have a loan
7  number that matches the BMW.  And Cindy Chapa has told
8  agents that, "That was the BMW in my name, but it was
9  really for the defendant when he would come to Kyle,
10 Texas, which is one of our properties," that is part of
11 the money laundering and bank fraud conspiracy, "when he
12 would come, he would use the BMW."
13            Additionally, there were notes that we
14 allege in our bank fraud conspiracy, notes on what was
15 called the Ware Roadhouse in McAllen, and also in Kyle,
16 Texas.  And there were notes that we allege that Chapa
17 committed bank fraud because she overinflated her means of
18 income to secure these notes at the direction of the
19 defendant.
20            And so we see, not extensively, but we do
21 have evidence of at least on two occasions where Zarate
22 paid approximately $2,100.  And you can see on one of the
23 checks -- I think it's Exhibit 1 -- and it shows that it
24 goes back to the loan numbers of Ms. Chapa, the mistress
25 of the defendant.

1          So there is this entanglement, this
2  relationship between those individuals.
3          And so we have our witnesses that we've
4  talked about, and what we want to at least stress to the
5  Court -- and we're not taking issues certainly with what
6  Mr. Flood has said on representations that we can or
7  cannot prove.  But what we want the Court to know and be
8  aware is that Pablo Zarate is going to be a name that will
9  be mentioned in this trial several times.
10          Pablo Zarate is an individual that will be
11  testified about.  Pablo Zarate checks to support the
12  defendant's mistress, or one of his mistresses, and Pablo
13  Zarate's taking over of the plane will definitely will be
14  introduced at this trial.
15          And so for the Court, I presume, the
16  consideration is does a civil forfeiture of the plane
17  that's in the indictment rise to that level of conflict?
18          So our purpose today was simply to try to
19  provide these facts to you so that you can make an
20  informed decision.  And, as always, the United States will
21  wait for your decision and proceed as you decide.
22          THE COURT:  Clarify what you expect to be
23  the testimony -- not that it's going to be true or
24  credible -- of all of those the witnesses.  You gave me
25  four names.

```
 1                    MR. YOUNG:  Correct.  I'm sorry?

 2                    THE COURT:  You gave me four names that you

 3     were asking the Court to take their -- what their

 4     testimony or the nature of their testimony would be, but

 5     did you cover all four of them?  I believe you said --

 6                    MR. YOUNG:  Yes.  Let me go through these

 7     again.

 8                    Yes.  So Cindy Chapa, we expect the

 9     testimony, we allege, that Ms. Chapa will testify with

10     regards to primarily the bank loan conspiracy, and that

11     she acted at the behest of the defendant to secure

12     American loans as a way to support herself by, and as a

13     way to help launder proceeds through into the United

14     States.  She will testify about the houses, for instance,

15     at Kyle.

16                    THE COURT:  Okay.  I just want a general,

17     something.

18                    MR. YOUNG:  Okay.  Sure.

19                    THE COURT:  You don't have to give me

20     details.

21                    MR. YOUNG:  Thank you.  Mr. Berlanga will

22     testify about the various ranches that he purchased at the

23     behest of Fernando Cano, and his knowledge of some of

24     those ranches directly direct knowledge of some of those

25     ranches having ties to or being owned by the defendant,
```

1    even though he was what they call the "presta nombre," the

2    person who signed for it.  But we expect -- we anticipate

3    that he will testify to that.

4                    Ms. De Pau, who is the ex-wife of Fernando

5    Cano, the co-defendant in this case, will testify that

6    their company, that she was a co-owner, Materiales

7    Construcsiones, that there was a hidden invoicing system

8    where hundreds of thousand, if not more, dollars that were

9    both for her and her husband, were sent out to help

10   support or provide or purchase ranches and other items in

11   part for this defendant.

12                   And then Antonio Pena is an associate for

13   a long time, actually the godson of one of the defendant's

14   children, and he will testify about the relationship with

15   Cindy Chapa, as an example, he will testify about Premier

16   Holdings and about the Pilatus plane, he will give an

17   overlay of the general corruption, or alleged payments

18   made to the defendant by various criminal entities.  And

19   he will give a broad overview.

20                   So obviously not trying to limit us to

21   that.  That's kind of a Cliff Notes of those individuals,

22   and each will have, will talk about Pablo Zarate in some

23   fashion.

24                   So that's the kind of testimony we

25   anticipate at trial.

1           THE COURT:  And you're making an offer of
2  exhibits?
3           MR. YOUNG:  The two exhibits, you have them
4  with you.  I'm sorry.  They were attached to the motion
5  that we filed.
6           THE COURT:  They're part of the pleadings.
7  Do you want them to be considered as evidence?
8           MR. YOUNG:  With the Court's permission, may
9  I go ahead and attach a couple of exhibits?
10           THE COURT:  Please.
11           MR. YOUNG:  Your Honor, with the Court's
12  permission, may I approach?
13           THE COURT:  Yes.
14           MR. YOUNG:  The United States is tendering
15  to the Court United States Exhibits 1 and 2 for offer into
16  admission.  And they have been previously tendered to
17  Mr. Flood.
18           MR. FLOOD:  No objection.
19           THE COURT:  Admitted.
20           MR. YOUNG:  That concludes my presentation,
21  subject to your questions, Your Honor.
22           THE COURT:  I did have one question.  So is
23  the government -- what is the government's position
24  regarding a motion to consolidate and the timing or the
25  necessity of, or whatever it is that you -- what your

 1    posture procedurally is.

 2                    MR. YOUNG:  To consolidate the two

 3    indictments?

 4                    THE COURT:  If -- what reason is there at

 5    this point in time for not moving or moving to

 6    consolidate?

 7                    MR. YOUNG:  The Zarate indictment to the

 8    Yarrington indictment?

 9                    THE COURT:  Yes.

10                    MR. YOUNG:  We really haven't discussed that

11    that much.  Since he is a fugitive, we don't, you know, if

12    there's a conflict, I don't believe the Court needs a

13    consolidation, would be my opinion.  And I'm thinking off

14    the top of my head, which sometimes is dangerous.  But I

15    don't think that you need that, necessarily.  So it was

16    indicted a few years later, it is a much more simpler

17    indictment.  I mean, I'm thinking off the top of my head

18    that if we consolidate it, if Mr. Zarate is here, at some

19    point they would make a motion to sever simply because

20    there's so much more material with regards the defendant

21    that we could anticipate a claim that says we need

22    severance because we're not part of 15, 20 pages of overt

23    acts.

24                    So we have not made a formal decision.

25    What we can just tell you is that he is indicted, he is

1    indicted I believe in 2015, out of the Corpus Division.

2    And the allegations in there primarily focus on the

3    Pilatus plane.  But it is a bank and money laundering

4    conspiracy.

5              Now, I did not indict that, so I'm not as

6    precisely familiar with that case, but it will -- it

7    should involve much of what we proffered to you, but right

8    now we have not made a decision on consolidation.

9              THE COURT:  All right.  Mr. Flood, in

10   conclusion?

11             MR. FLOOD:  Yes, Your Honor.  I'd just like

12   to clarify a few things.

13             I didn't have any objection to

14   Government's Exhibit 1 and 2, only because they may say

15   the name Pablo Zarate on it, and they may be offered as

16   evidence against Mr. Yarrington, but Mr. Zarate is not

17   going to be sponsoring these exhibits, and he won't be a

18   witness for the government.

19             Just so the record is clear, I have never

20   represented, had any conversations with Cindy Chapa,

21   Antonio Pena, Eduardo -- Antonio Pena Juarez, Eduardo Pena

22   or Sonia De Pau.

23             It's not a situation where I'm trying to

24   represent a defendant where one of the government

25   witnesses, one of the government witnesses I've previously

1    represented.

2              Also, this idea that Mr. Zarate is a

3    fugitive, I guess technically he is.  The timetable is

4    this:  He made a claim through another lawyer, Ernesto

5    Gamez from The Valley who made a claim for his airplane,

6    and it was while he was in Mexico fighting that claim that

7    they charged him.  So it wasn't a situation where he was

8    released on bond here and then fled to Mexico.

9              And I don't represent Mr. Zarate anymore.

10   I only represented him on that limited purpose of trying

11   to get the airplane back in 2016 in Corpus Christi.  There

12   was no communications with him Yarrington or Yarrington

13   indictment or anything like that.

14             So the very fact that he's not a current

15   client, that he's not a current co-defendant that I have

16   torn loyalties to, that he's not a government witness that

17   I might be privy to some confidential communications, I

18   just don't see a conflict in me representing Yarrington.

19   And to the extent that there's a potential at all, both

20   parties, both Mr. Yarrington and Mr. Zarate have been

21   fully apprised of that by independent counsel, and have

22   signed waivers saying, "We understand that there was this

23   very remote situation involving Mr. Flood and Mr. Zarate,"

24   and we waive that, Your Honor.

25             So I think Mr. Yarrington is entitled to

1  his counsel of choice.  And just as a sidenote, Your

2  Honor, I've already been in discussions with

3  Mr. Mosbacker.  In the event I am able to represent

4  Mr. Yarrington, I plan on retaining Mr. Mosbacker because

5  he has so much history with this case already.  It would

6  be silly not to do so.

7           THE COURT:  All right.  Can I rely upon a

8  representation that the government would agree to that, in

9  March 2015, you were retained by Pablo Zarate Juarez to

10  represent you -- to represent him in a criminal

11  investigation and made efforts to recover a 2005 Pilatus

12  airplane which had been seized from him?

13           MR. FLOOD:  Yes, I did represent him in that

14  regard, Your Honor.

15           THE COURT:  Would the government dispute

16  that if that was a proffer --

17           MR. YOUNG:  No, Your Honor.

18           THE COURT:  -- a fact that the Court could

19  take into account?

20           MR. FLOOD:  Sure.

21           THE COURT:  Would the government or you,

22  Mr. Flood, ask the Court to accept as a proffer that Pablo

23  Zarate Juarez did share with you his June 25, 2015,

24  statement to the Attorney General of the United States?

25           MR. FLOOD:  Yes, Your Honor.  In fact, I

1  think that's attached to his declaration.

2              THE COURT:  I'm asking individually more

3  specifically.

4              MR. FLOOD:  Yes, Your Honor.

5              THE COURT:  Does the government agree to

6  the -- does the government have any basis for disputing

7  that?

8              MR. YOUNG:  No, Your Honor.

9              THE COURT:  Would there be any problem or a

10  dispute the Court would take into account, at least as a

11  fact, in connection with this motion, that Mr. Flood

12  represented Mr. Zarate's interests in recovering that the

13  subject airplane in the district court and in the Fifth

14  Circuit Court of Appeals, and that in November 2016,

15  Mr. Flood's representation was terminated.  Is that an

16  accurate --

17              MR. FLOOD:  That's correct, Your Honor.

18              THE COURT:  -- representation?

19              MR. YOUNG:  We have no evidence to dispute

20  that, Your Honor.

21              THE COURT:  All right.  And I wanted to also

22  hear from -- and, Mr. Mosbacker, anything you wish to say

23  to the Court, an argument or a proffer of evidence?

24              MR. MOSBACKER:  No, Your Honor.  We've

25  already stated we do not oppose Mr. Flood coming into the

1  case.

2                    THE COURT:  All right.

3                    MR. MOSBACKER:  Substituting as counsel of

4  record.

5                    THE COURT:  All right.  Let me see if I need

6  to ask a question.

7                         Okay.  I expect to be able to rule on the

8  motion by sometime today, today's date, the order laying

9  out my rationale.  It will be coming sometime next week in

10  all likelihood after the holiday.  But, of course, I want

11  to do it as quickly as possible, consistent with justice.

12                         So if there's a reason for the delay or --

13  you'll be notified.  But one way or the other I hope to

14  have a ruling for you sometime today.

15                    MR. FLOOD:  Thank you, Your Honor.  Just for

16  the record, Your Honor, the defendant is available and can

17  testify to the signing of the declaration if the Court

18  needs to inquire.

19                    THE COURT:  It's your motion.

20                    MR. FLOOD:  Okay.

21                    THE COURT:  Do you wish to open?

22                    MR. FLOOD:  Well, no -- well, Your Honor,

23  I've offered his declaration.  I believe my review of the

24  case law is that the Court is supposed to inquire of the

25  defendant personally on whether or not he understood the

 1    waiver and all that.  I stand by his statements in the

 2    declaration, but I'm only mentioning it to the Court based

 3    on my review of the cases.

 4              THE COURT:  Well, this is your motion.  It's

 5    up to you to decide what evidence the Court should have

 6    before it.

 7              MR. FLOOD:  Well, I have -- I have the

 8    declarations that I've already introduced in evidence,

 9    Your Honor.  If I may, I'll call the defendant as a

10    witness, Your Honor.

11              THE COURT:  Okay.  Clear the field.

12    Approach the bench.  And he can testify from the -- he can

13    at stand beside you to testify, Mr. Flood.

14              MR. FLOOD:  I'm sorry, Your Honor?

15              THE COURT:  He can stand beside you.  Sir,

16    would you please raise your right hand so that you may be

17    sworn.

18              CASE MANAGER:  Do you solemnly swear that

19    the testimony you are about to give will be the truth, the

20    whole truth and nothing but the truth, so help you God?

21              THE DEFENDANT:  I swear.

22              THE COURT:  Good morning, sir.  All right.

23

24

25

1                    **TOMAS YARRINGTON RUVALCABA,**

2  after having been first cautioned and duly sworn, testified

3  as follows:

4                    THE COURT:  You may proceed, Mr. Flood.

5                    MR. FLOOD:  Thank you, Your Honor.

6                    **DIRECT EXAMINATION**

7  BY MR. FLOOD:

8  **Q.**    Mr. Yarrington --

9                    THE COURT:  Sir, by the way, let me do this

10  as a precaution.

11                    Sir, you've been placed under oath.  That

12  means you have to answer all questions posed to you by

13  Mr. Flood or myself truthfully.  If you do not answer

14  truthfully, you could be prosecuted for perjury for making

15  a false statement in an official proceeding with the

16  intent to mislead the tribunal.  Do you understand that?

17                    THE DEFENDANT:  I understand it, yes, ma'am.

18                    THE COURT:  And one other thing I want as

19  well.  Although your educational background is something

20  that is generally available in doing a Google search,

21  please, for the record, spell out for me or give me the

22  degrees you hold and what institutions they are from.

23                    THE DEFENDANT:  I have a master's degree in

24  public administration from the University of Southern

25  California.  And I have a bachelor's degree in economy

1  from the Institutos Superiores de Monterrey.  And I have

2  done some law school -- I haven't finished -- at

3  Universidad de Nuevo Leon.

4              THE COURT:  And do you speak English?

5              THE DEFENDANT:  I don't feel confident.  I

6  understand everything, Your Honor, but I don't feel

7  confident.  I studied it a little bit at the University of

8  Los Angeles, but when I speak in English, I don't feel

9  confident.

10             THE COURT:  And your master's degree that

11  you received in California, did you take those classes in

12  English?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  Were the lectures in English and

15  were the exams in English?

16             THE DEFENDANT:  All of it was English, Your

17  Honor.  Is because my English is real poor, and it's not

18  frank enough.  In this case I prefer to understand

19  everything.

20             THE COURT:  I understand.  I just want make

21  sure that I have something in the record.  And,

22  furthermore, did you write a master's thesis?

23             THE DEFENDANT:  No.  I did a research about

24  homeless people in Los Angeles, but I did not write -- a

25  thesis was not required.

1          THE COURT:  Whatever papers were required

2  for your course work, were they done -- did you do them in

3  English?

4          THE DEFENDANT:  Yes.

5          THE COURT:  All right.  Thank you.

6  Mr. Flood, you may proceed.

7          MR. FLOOD:  Thank you, Your Honor.

8  BY MR. FLOOD:

9  **Q.**    Mr. Yarrington, I'm going to show you what has been

10  admitted before the Court as Exhibits 3A and 3B, and ask

11  you if you can identify these exhibits.

12  **A.**    Yes.

13  **Q.**    And could you tell the Court --

14  **A.**    I identify them, Your Honor.

15  **Q.**    And can you tell the Court what Exhibits 3A and 3B

16  are?

17  **A.**    Your Honor, an independent counsel clearly explained

18  the implications to me of the fact that, or if Mr. Flood

19  would represent me.  And he explained to me that I have

20  the right to have a conflict-free attorney.

21          After that explanation, I consciously, I

22  waived might rights to have a conflict-free attorney, and

23  I respectfully ask Your Honor that to allow Mr. Flood to

24  be the one who represents me.

25  **Q.**    Specifically in your conversations with that other

1  lawyer, did you and he discuss some of the dangers

2  associated with having me represent you, knowing that I

3  formally represented Mr. Zarate?

4  **A.**    Yes, Your Honor.  He told me that in the event that

5  the government present Mr. Pablo Zarate as their witness,

6  Mr. Flood cannot do a cross interrogation or

7  cross-examination.

8  **Q.**    Did Mr. Akers also explain to you that if the

9  opportunity arises, if I currently represent Mr. Zarate, I

10  would have had possibly torn loyalty between me and you?

11  **A.**    Yes, he explained that to me.

12  **Q.**    And did he explain that you have a right to have a

13  lawyer who doesn't have torn loyalties?

14  **A.**    Yes, Your Honor, he explained that.

15  **Q.**    And after discussing this with Mr. Akers, did you

16  feel like you were making a knowing, intelligent waiver of

17  your right to conflict-free counsel?

18  **A.**    Your Honor, I think that I am making a conscious,

19  conscientious, and also intelligent decision.

20  **Q.**    And can you tell the Court who you want as your

21  attorney to represent you?

22  **A.**    Your Honor, I want Mr. Flood to represent me.  I want

23  Mr. Flood to be my attorney.

24  **Q.**    Knowing of the potential conflict of my prior

25  representation of Mr. Zarate?

1    **A.**   With awareness of the potential of conflict of

2    interest with regards to Mr. Zarate.

3              MR. FLOOD:  I don't have anything further,

4    Your Honor.

5              THE COURT:  Cross-examination?

6              MR. YOUNG:  Nothing, Your Honor.

7              MR. FLOOD:  One other matter.  I'm sorry,

8    Your Honor.  I know they didn't cross, but I forgot to

9    ask.

10   BY MR. FLOOD:

11   **Q.**   You know that by signing this waiver, and by telling

12   the Court that you want to waive your right of

13   conflict-free counsel, you can't later claim on appeal

14   that you were denied your right to conflict-free counsel?

15   **A.**   That has been made clear to me, Your Honor.

16             MR. FLOOD:  I have nothing further.

17             THE COURT:  Anything else?  Any other

18   evidence on behalf of Mr. Yarrington or the government?

19             MR. YOUNG:  Not from the United States, Your

20   Honor.

21             MR. FLOOD:  Nothing from Mr. Yarrington's

22   behalf, Your Honor.

23             THE COURT:  All right.  If there's nothing

24   further before the Court in connection with this motion to

25   substitute counsel today, we're in recess.  Thank you.

1          MR. FLOOD:  Thank you, Your Honor.

2                    **(Recessed at 10:07 a.m.)**

3                 **COURT REPORTER'S CERTIFICATE**

4

5   I, Johnny C. Sanchez, certify that the foregoing is a

6   correct transcript from the record of proceedings in the

7   above-entitled matter.

8

                              /s/_____
9                             Johnny C. Sanchez, CRR, RMR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25